**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**BAYSHORE ASSOCIATES, INC., a Michigan corporation,
Defendant–Appellant.**

Nos. 89–1454, 89–2112.

United States Court of Appeals,
Sixth Circuit.

Submitted March 25, 1991.

Decided May 30, 1991.

Geneva S. Halliday, Asst. U.S. Atty., Jennifer J. Peregord, Office of the U.S. Atty., Detroit, Mich., for plaintiff-appellee.

David J. Haywood, Miller, Johnson, Snell & Cumminskey, Grand Rapids, Mich., Michael E. Tindall, Judith R. Weinstein, St. Clair Shores, Mich., for defendant-appellant.

Before GUY and NORRIS, Circuit Judges; and WELLFORD, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Plaintiff, the United States Army Corps of Engineers (the government), sought to enjoin defendant, Bayshore Associates, Inc. (Bayshore), from dredging and dumping dredge spoils. The action was brought pursuant to the Clean Water Act of 1977, 33 U.S.C. § 1251 *et seq.*, and the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq.* The district court granted plaintiff's motion for a temporary restraining order (TRO) and later granted a preliminary injunction. Defendant appeals the following: the district court's grant of a TRO to prevent Bayshore from dredging at the Bayshore Boat Club in Fair Haven, Michigan; the district court's subsequent finding of Bayshore in contempt of the TRO on both February 17 and April 12, 1989; and the preliminary injunction that the district court issued against dredging on August 2, 1989.

Bayshore argues that the TRO was vague and overbroad in violation of Federal Rule of Civil Procedure 65. Additionally, Bayshore argues that, although the district court stated it was holding Bayshore in civil contempt of the TRO, the court actually subjected Bayshore to criminal contempt sanctions. Finally, Bayshore challenges the notice and propriety of the preliminary injunction, termed a permanent injunction by the district court. With the exception of the April 12, 1989, contempt order, we find defendant's arguments without merit and, accordingly, affirm. The fine imposed by the district court in its April 12, 1989, contempt order was a criminal fine. We therefore vacate the portion of the contempt order that imposed a fine on Bayshore.

I.

In August 1988, Bayshore applied for a permit to the Army Corps of Engineers to obtain authorization for maintenance dredging. Bayshore stated that it wanted to dredge 1,000 cubic yards of material and that it would place the dredged material, so-called dredge spoils, on land known as the Vernier site.

The Army Corps of Engineers issued Bayshore a permit. The permit authorized Bayshore to dredge 1,000 cubic yards of material and dispose of it on the Vernier site. Further, the permit provided that Bayshore would be required to obtain review of any changes in the location of the disposal site.

Bayshore subsequently decided to change the location of the disposal site without the required pre-authorization. Bayshore proceeded to put the dredge spoil at the new site. The government alleged that the new, unauthorized site included a wetland area. As a result, Bayshore's actions violated section 404 of the Clean Water Act, 33 U.S.C. § 1344.

In response to the government's request, the district court issued a TRO on February 10, 1989, against Bayshore. The TRO prohibited Bayshore "from dredging in the navigable waters of the United States or disposing of dredged materials in the waters of the United States including its adjacent wetlands."

While the TRO was in effect, several individuals observed Bayshore continuing to dredge. On February 16, 1989, the government moved to hold Bayshore in contempt. At the contempt hearing, Bayshore argued that it was not dredging; rather, it was only breaking a concrete boat launch above the water line, which involved pulling cement blocks from the water onto land. The government argued that Bayshore was dredging because its activities brought up "clay and muck." Further, the government argued that "[i]f you go below the water mark [or line] you're dredging." The court concluded in

part, based on defendant Bayshore's own witnesses, that Bayshore was dredging. As a result, the district court granted the government's motion and, by way of sanctions, expanded the original TRO to include the following:

1. Defendant and its agents are prohibited from doing any and all work below the water line until a permit is granted by an appropriate agency or until further order of this court.

2. Defendant and its agents are prohibited from removing or relocating any dredged or spoil material, including concrete, from the area commonly known as the Bayshore Boat Club, without a valid permit or specific agreement from the U.S. Army Corps of Engineers or without prior approval of this Court.

On February 17, 1989, the parties stipulated to the extension of the TRO and the sanctions. The stipulation was to "remain in effect until a decision [was] rendered on the plaintiff's motion for a preliminary injunction or until further order of the court."

Upon hearing reports from observers that Bayshore placed several floating docks at the Bayshore Boat Club after the February 17 order, the government sought to have Bayshore held in contempt. Bayshore argued that because the docks floated on the water, their placement did not constitute activity below the water line, which was prohibited. The court found, however, that Bayshore violated the earlier order when it put the docks in the water. As a result, the court imposed the following additional sanctions:

1. Bayshore Associates, Inc.'s president, Michael Tindall, shall report at 10:00 a.m. on April 13, 1989 to the custody of the United States Marshal. Mr. Tindal [sic] shall remain in the Marshal's custody until all of the docks placed since February 17, 1989 by defendant, are removed to the satisfaction of the U.S. Army Corps of Engineers. Mr. Tindall will be released from the custody of the United States Marshal only after the parties appear before this Court and verify that the docks have been removed.

2. Bayshore Associates, Inc. shall pay a committed fine of $5,000.00 due within ten days from April 12, 1989.

On April 12, 1989, Bayshore filed a motion to dissolve or, in the alternative, receive partial relief from the TRO. To enable Bayshore to continue its business activities throughout the boating season, the parties and court agreed to a modified order on April 28, 1989. This order allowed Bayshore to launch or remove boats in the ordinary course of marina business, allowed placement of non-contested docks as well as removal of a cofferdam, and permitted the removal of approximately two to three yards of existing dredge spoils.

A hearing on the motion to dissolve was not held until August 2, 1989. At the hearing, the government requested that the court permanently enjoin Bayshore from dredging. The court denied Bayshore's request to dissolve the injunction and granted the government's motion for a permanent injunction. The court's order, entitled "ORDER GRANTING PERMANENT INJUNCTION," stated:

IT IS ORDERED AND ADJUDGED for reasons stated on the record, that Defendant's motion to modify this Court's Temporary Restraining Order is DENIED.

IT IS FURTHER ORDERED AND ADJUDGED for reasons stated on the record, that defendant, Bayshore Associates, Inc., and its employees and agents, are hereby permanently enjoined from dredging in the navigable waters of the United States or disposing of dredged materials in the waters of the United States, including its adjacent wetlands, without first obtaining a permit from the United States Army Corps of Engineers.

IT IS FURTHER ORDERED AND ADJUDGED for reasons stated on the record, that this Court's Order finding defendant in civil contempt entered on February 17, 1989, and as modified by this Court's Order of April 28, 1989, shall remain in full force and effect.

Bayshore appealed.

## II.

Bayshore argues that the district court abused its discretion when it issued a

"permanent injunction" against dredging or disposing of dredged material in the navigable waters of the United States. The government "concedes that permanent injunctive relief cannot properly be awarded in advance of [an] upcoming trial." Instead, the government argues that the order was the district court's "attempt to formalize and consolidate [its] prior orders." We agree.

Although the district court inartfully called its order a permanent injunction, it was, in effect, a preliminary injunction. We have previously held that the actual effect of an order, rather than the district court's characterization of it, shall be considered on appeal. *American Motors Corp. v. FTC*, 601 F.2d 1329, 1331–32 (6th Cir.), *cert. denied*, 444 U.S. 941, 100 S.Ct. 294, 62 L.Ed.2d 307 (1979). Thus, for the purposes of this appeal we will treat this order as a preliminary injunction.

The government argues that our jurisdiction to review the district court's preliminary injunction is discretionary. We disagree.

■ Although the general rule is that an appellate court can review only final judgments, 28 U.S.C. § 1292(a)(1) creates an exception for interlocutory orders. Section 1292(a) provides that "the courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions...." The preliminary injunction issued by the district court in the present case falls precisely within the ambit of the statutory language. Indeed, our court normally assumes, without extensive discussion, that appeals from preliminary injunctions are appeals as of right pursuant to section 1292(a)(1). *See, e.g., Sutton v. Evans*, 918 F.2d 654, 655 (6th Cir.1990); *Moraine Indus. Supply, Inc. v. Sterling Rubber Prods.*, 891 F.2d 133, 135 (6th Cir.1989); *Beukema's Petroleum Co. v. Admiral Petroleum Co.*, 613 F.2d 626, 626 (6th Cir. 1979) (per curiam).

■ The government, however, argues that the Supreme Court in *Carson v.* *American Brands, Inc.*, 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981), articulated a rule that militates against review of the preliminary injunction in this case. The Title VII plaintiffs in *Carson* appealed from the district court's refusal to approve of a consent decree, which was the product of a settlement agreement between the parties. The Supreme Court concluded that the district court's refusal had the "practical effect of refusing an injunction" because the decree "would have permanently enjoined respondents from discriminating against black employees[.]" *Id.* at 84, 101 S.Ct. at 996. Although the Supreme Court ultimately held that it had jurisdiction pursuant to section 1292(a)(1), it held that the availability of review was limited.

[A] litigant must show more than that the order has the practical effect of refusing an injunction. Because § 1292(a)(1) was intended to carve out only a limited exception to the final-judgment rule, we have construed the statute narrowly to ensure that appeal as of right under § 1292(a)(1) will be available only in circumstances where an appeal will further the statutory purpose of "permit[ting] litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence." Unless a litigant can show that an interlocutory order of the district court might have a "serious, perhaps irreparable, consequence," and that the order can be "effectually challenged" only by immediate appeal, the general congressional policy against piecemeal review will preclude interlocutory appeal.

*Carson*, 450 U.S. at 84, 101 S.Ct. at 996–97 (citation omitted). The government contends this language makes our review of preliminary injunctions discretionary. We find, however, that the *Carson* Court's additional requirement of "a serious, perhaps, irreparable consequence" applies only to those court orders that have the "practical effect" of modifying, granting, or denying an injunction, not to orders specifically granting or denying injunctions.

**1396**

A Supreme Court decision post-*Carson* supports our conclusion. In *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988), the Supreme Court stated, albeit in dicta:

> Section 1292(a)(1) will, of course, continue to provide appellate jurisdiction over orders that grant or deny injunctions and orders that have the practical effect of granting or denying injunctions and have " 'serious, perhaps irreparable, consequence.' "

*Id.* at 287–88, 108 S.Ct. at 1142–43 (citation omitted). The additional requirement of a serious and irreparable consequence modifies only those orders that have the *practical effect* of granting or denying injunctions, not those orders explicitly called preliminary injunctions.

The circuits that have specifically considered the government's argument have unanimously rejected it. For example, the Fifth Circuit held that "[t]he orders at issue in *Carson*, [and two other cases], were not denominated injunctions, they merely had the practical effect of an injunction. . . . *Carson* does not apply to orders specifically granting or denying injunctions." *Atwood Turnkey Drilling v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1176 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990). *See Tri–State Generation & Trans. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1351 (10th Cir.1989) ("*Carson* and its progeny do not deal with interlocutory orders that explicitly deny or grant a motion for injunctive relief but with orders that have 'the practical effect of refusing an injunction.' "); *I.A.M. Nat'l Pension Fund Benefit Plan v. Cooper Ind., Inc.*, 789 F.2d 21, 24 n. 3 (D.C.Cir.) ("*Carson* does not apply to an order clearly granting or denying a specific request for injunctive relief; such orders are always appealable under § 1292(a)(1)."), *cert. denied,* 479 U.S. 971, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986); *Cable Holdings of Battlefield, Inc. v. Cooke,* 764 F.2d 1466, 1471 (11th Cir.1985) ("By its own terms, *Carson* applies only to interlocutory orders that have '*the practical effect* of refusing an injunction.' Here, the district court *explicitly* denied [plaintiff's] motion for a preliminary restraint. Hence, the interlocutory order in this case fits squarely within the plain language of § 1292(a)(1), and *Carson* is inapposite." (Citation omitted)); *Donovan v. Robbins,* 752 F.2d 1170, 1174 (7th Cir.1984) ("*Carson,* we conclude, requires that irreparable harm be shown whenever a party wants to appeal immediately . . . an interlocutory order that while not explicitly the grant or denial of a preliminary injunction may have consequences . . . similar to those of such an order.") Thus, our holding is in accord with at least five other circuits.

■ Since we conclude that the defendant has an appeal as of right from a preliminary injunction, we must next consider the merits of defendant's argument, *i.e.,* whether the defendant had adequate notice and opportunity to respond. At the hearing on August 2, 1989, defendant was represented by counsel. Defendant's counsel requested that the TRO, which was extended by the parties' stipulation, be withdrawn. In the alternative, defendant's counsel requested that the court spell out "what it is that we're restrained from doing and . . . have that order then entered as a preliminary injunctive order." Defendant's counsel did not raise any objection at that time to the notice it had for the hearing. At the hearing, defendant's counsel presented his client's position and informed the court about the status of Bayshore's ability to conduct business under the restraining order. Thus, Bayshore's argument on appeal, that it did not have notice of the hearing and an opportunity to be heard, is without merit.

### III.

■ Bayshore argues that the TRO issued by the district court on February 10, 1989, was overbroad and vague and that the district court failed to apply the appropriate legal standards to justify issuing it. In response, the government argues that TROs are non-appealable interlocutory orders. The government then argues that this court does have appellate jurisdiction,

however, because the TRO that was extended by stipulation became, in effect, a preliminary injunction.[1] If a TRO can be deemed a preliminary injunction, it is appealable pursuant to 28 U.S.C. 1292(a)(1).

Not all circuits routinely allow appeals from TROs that have been extended by stipulation for an indefinite period. In *Ross v. Evans*, 325 F.2d 160 (5th Cir.1963) (per curiam), the Fifth Circuit held:

> Where, as here, the temporary restraining order has been entered by consent until the further order of the court, and no application has been made to dissolve the restraining order, and no orders have been made with respect to the restraining order except to continue it in force, it will not have lost its character as a nonappealable temporary restraining order and become converted into an appealable preliminary injunction.

*Id.* at 160–61.[2] Although *Ross* has been interpreted broadly to prohibit any appeal from a stipulated TRO,[3] *Ross* could also be interpreted to mean that the appealability of a TRO rests on whether the restrained party filed a motion to modify the TRO.

Rather than focusing on the acts of the restrained party, other circuits have reviewed a variety of factors in deciding whether a stipulated TRO becomes a preliminary injunction. They have examined the underlying rationale for the rule against review of TROs, and have concluded that the factors that usually militate against review of TROs are no longer present when a TRO is extended for an indefinite or lengthy period. The Third Circuit, in reviewing a TRO that was in effect for 40 days, at which time a contempt motion was brought, relied on several factors to assert jurisdiction. *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1150 (3d Cir.1982). First, the order had been extended indefinitely by the district court. Second, action taken by the court of appeals could not "interfere with any of the district court's proceedings." *Id.* at 1154. Third, before the appeal was taken, no preliminary injunction hearings were held. Fourth, the merits of the TRO were not before the court; rather, the court was addressing whether the defendant was properly held in contempt. *Id.* at 1155; *see also New York Tel. Co. v. Communication Workers of Am.*, 445 F.2d 39, 46 (2d Cir.1971) ("At least where the restraining order has been in effect for many months and where there is no possibility of interfering with the district court's orderly disposition of a motion for a preliminary injunction, the rationale against reviewing a grant or denial of a temporary restraining order is absent.")

Rather than explicitly examining several factors, the Eighth Circuit has a simplified test for determining whether or not a TRO extended by stipulation has evolved into an appealable preliminary injunction. "If the order is in substance a preliminary injunction rather than a temporary restraining order, it is appealable under § 1292(a)(1)." *Nordin v. Nutri/System, Inc.*, 897 F.2d

---

**1.** Parties can mutually consent to the extension of a TRO pursuant to Fed.R.Civ.P. 65(b). A TRO may be extended beyond a ten-day period if "the party against whom the order is directed consents that it may be extended for a longer period."

**2.** A more recent Fifth Circuit decision, although citing *Ross* for support, seems to indicate a move away from *Ross*. In *Hunt v. Bankers Trust Co.*, 799 F.2d 1060 (5th Cir.1986), the defendant banks argued that several orders issued by the district court were not appealable. In *Hunt*, the parties had "agreed that the court would enter a preliminary injunction that would continue the terms of the temporary restraining order...." *Id.* at 1065. The banks argued that because a party cannot appeal an order to which it agreed, the court was without jurisdiction to entertain plaintiffs' arguments on appeal. *Id.* at 1066. In response to this argument, the Fifth Circuit stated, "[t]hat is correct, but this objection relates to whether the appellate court will grant relief, and is not a basis to refuse jurisdiction." *Id.* (footnotes omitted). Thus, while the *Ross* court denied appellate jurisdiction because the parties had stipulated to the extension of the district court's order, the *Hunt* court exercised jurisdiction under similar circumstances, and held that plaintiffs' stipulation would be considered in a decision on the merits.

**3.** The Eleventh Circuit, citing *Ross*, stated that "a temporary restraining order issued or extended with the consent of all parties remains a nonappealable order." *Fernandez–Roque v. Smith*, 671 F.2d 426, 430 (11th Cir.1982).

339, 342 (8th Cir.1990). To apply the Eighth Circuit test, one would need to review the circumstances of the case in a way that is similar to the approaches adopted by the Second and Third Circuits.

In the present case, the parties stipulated to the indefinite extension of the TRO on February 17, 1989. This stipulation remained in effect until it was superseded by the preliminary injunction issued by the court on August 2, 1989; the TRO was therefore in effect for over four months. The duration of the TRO suggests that it was actually more like a preliminary injunction in nature. Additionally, review is particularly appropriate here, where the chief issue on appeal involves the propriety of holding the defendant in contempt, a review which will have no effect on the district court's timely disposition of the case.

We conclude that we have jurisdiction to entertain the merits of the TRO and the accompanying civil contempt orders pursuant to 28 U.S.C. § 1292(a)(1) because once the TRO was extended by the parties' stipulation it became, for all intents and purposes, a preliminary injunction.[4] We note that an affirmative conclusion on the issue of appellate jurisdiction of the TRO is a prerequisite to our consideration of Bayshore's challenge of the two civil contempt orders because "a judgment of civil contempt is not a final decree and therefore is not appealable in itself. However, where the validity of the underlying order or injunction is questioned on appeal there may also be an appeal of a remedial civil contempt order." *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir.1976).[5]

■ We review a district court's grant of a preliminary injunction under an abuse of discretion standard. *Tyson Foods, Inc. v. McReynolds*, 865 F.2d 99, 101 (6th Cir.

1989); *Martin–Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 564 (6th Cir.1982).

[I]n determining on appeal whether the district court abused its discretion in granting or withholding preliminary injunctive relief, this circuit has set forth four standards which must be considered: 1) whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits; 2) whether the plaintiffs have shown irreparable injury; 3) whether the issuance of a preliminary injunction would cause substantial harm to others; 4) whether the public interest would be served by issuing a preliminary injunction.

*Tyson*, 865 F.2d at 101.

Applying these factors, we conclude that the district court did not abuse its discretion. The government represented the public interest when it sought to enjoin Bayshore from dumping on legally protected wetlands. Also, if dredge spoils were dumped on the wetlands, it could foreseeably cause irreparable harm. Finally, because Bayshore did not deny that it changed the dumping location in contravention of its permit,[6] the government showed that it was likely to succeed on the merits.

■ We also find no merit to defendant's argument that the preliminary order was overbroad and vague. Rather, from the record it appears as though Bayshore was trying to find ambiguity where there was none. The order prohibited Bayshore "from dredging in the navigable waters of the United States or disposing of dredged materials in the waters of the United States including its adjacent wetlands." Bayshore argues that the order is overbroad because it prevents authorized and exempt dredging as well as unauthorized dredging. The problem with Bayshore's argument is that the crux of the dispute

---

**4.** Since we find that the TRO became a preliminary injunction, a *Carson* analysis for serious or irreparable harm is unnecessary.

**5.** Bayshore argues that it did not stipulate to an indefinite extension of the TRO and, as a result, the TRO expired on February 21, 1989. The stipulation, however, has no expiration date on it and, thus, Bayshore's argument is without

merit. Bayshore also argues that the TRO did not become a preliminary injunction. We find this argument meritless also. In fact, if this were true, Bayshore would be unable to appeal the contempt orders.

**6.** In fact, Bayshore admitted it had dumped on a wetlands site.

between Bayshore and the Army Corps of Engineers is a dispute as to which activities were authorized or needed authorization and which activities required no permit whatsoever. To preserve the status quo, the district court temporarily enjoined all dredging, which was completely within its discretion. Additionally, any ambiguity in the TRO was eliminated by the district court's subsequent order on February 17, 1989.

### IV.

 Bayshore argues that the contempt order of February 17, 1989, was criminal in nature and that the district court mischaracterized it as civil. As such, Bayshore claims that it was denied an adequate hearing and that the contempt order should be vacated.

Bayshore continued to dredge after the TRO was issued, even though dredging was specifically prohibited by the TRO. Bayshore argued that it was removing a concrete slab that was part of a boat launch, which was sitting on another concrete slab under the water. At the contempt hearing, counsel for the defendant argued that it was not dredging, which would be in violation of the TRO; rather, it was "removing a structure."

The "sanctions" imposed by the district court in the contempt order were not really sanctions at all. The sanctions merely clarified any existing ambiguity in the TRO's language. Indeed, the district court gave the defendant the benefit of the doubt and took defendant's somewhat specious argument at face value. The following statement by the district judge supports our conclusion:

> This Court finds it difficult to believe that they thought they could be removing a slab of concrete, even if it was placed on top of another slab of concrete, without disturbing—without removing dredged materials, as specifically prohibited by this Court's earlier order.
>
> By the testimony of your [defendant's] own witnesses, that lower piece of concrete had a hole in it. Any activity on top would be disturbing the soil, the bed,

if you will, as that concrete was being, not only removed but cracked, made smaller, so that you could get it out. In doing so there's every possibility that pieces were falling in and they were going after them to remove them.

> I simply find it not credible, the defendants' argument, that they could do all of this and not violate the Court's order. These activities, as they're described to me, fall within the definition of dredging.
>
> I find the witnesses credible—the government's witnesses.
>
> I find the defendants in this case well knew what they were doing. If there was any doubt about what the Court intended, they could have well come back for clarification of the Court's order. They didn't do so. They undertook to make their own determination of what this Court's decree meant. They well knew. They acted at their peril. They were alerted by the decree against any violation.

. . . . .

> On that basis then this Court, at this time, having found the defendants in civil contempt, will order that in lieu of a fine or [ ] jail—and I must say to you I weighed both—I will order that all work below the water line is prohibited until a permit is granted by an appropriate agency or until further order of this Court.

As a result, we conclude that the "sanctions" imposed by the district court in its February 17, 1989, order are not criminal in nature.

### V.

 Bayshore also argues that the sanctions imposed by the court on April 12, 1989, are criminal in nature and not civil, as the district court characterized them. As we stated previously, the second contempt order required Tindall to be incarcerated until the floating docks were removed and also required Bayshore to pay a $5,000 fine.

■ Broadly, the purpose of civil contempt is to coerce an individual to perform an act or to compensate an injured complainant. *See United States v. Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701–02, 91 L.Ed. 884 (1947) (purpose of civil contempt is "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained"); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911) (in civil contempt "the punishment is remedial, and for the benefit of the complainant"); *Spindelfabrik Suessen–Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 903 F.2d 1568, 1578 (Fed.Cir.1990). Whereas, the purpose of criminal contempt is punitive—"to vindicate the authority of the court." *Gompers*, 221 U.S. at 441, 31 S.Ct. at 498. The same conduct, however, may be subject to both criminal and civil contempt sanctions.

■ Incarceration has long been established as an appropriate sanction for civil contempt. *See, e.g., Hicks v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988) ("If the relief provided is a sentence of imprisonment, it is remedial if 'the defendant stands committed unless and until he performs the affirmative act required by the court's order,' and is punitive if 'the sentence is limited to imprisonment for a definite period.' "); *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966) ("Where contempt consists of a refusal to obey a court order to testify at any stage in judicial proceedings, the witness may be confined until compliance."); *Gompers*, 221 U.S. at 442, 31 S.Ct. at 498 ("If a defendant should refuse to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance required by a decree for specific performance, he could be committed until he complied with the order.") As used in the civil context, however, incarceration must be conditional. That is, once the defendant performs the act required by the court, he must be released. The Supreme Court noted in *Hicks* that "[t]he critical feature that determines whether the remedy is civil or criminal in nature is not when or whether the contemnor is physically required to set foot in a jail but whether the contemnor can avoid the sentence imposed on him, or purge himself of it, by complying with the terms of the original order." 485 U.S. at 635 n. 7, 108 S.Ct. at 1431 n. 7. *Cf. Roe v. Operation Rescue*, 919 F.2d 857, 869 (3d Cir.1990) ("If the contemnor is imprisoned for a definite period ... the contempt proceeding is, by definition, criminal."); *SEC v. Simpson*, 885 F.2d 390, 395 (7th Cir.1989) ("A criminal contempt proceeding is characterized by the imposition of an unconditional and determinate sentence for the purpose of punishment or deterrence.")

In the present case, Tindall was not required to stay in jail once the floating docks were removed. Indeed, by the time Tindall was required to report to the United States Marshal, the day after the district court issued the contempt order, the docks had been removed and Tindall was released.

■ Bayshore also argues that the fine it paid was criminal and not civil. There are two types of civil fines: "The first kind is payable to the complainant as compensation for damages caused by the contemnor's noncompliance." *Roe v. Operation Rescue*, 919 F.2d 857, 868 (3d Cir. 1990); *see Hicks*, 485 U.S. at 632, 108 S.Ct. at 1429. "Such fine must of course be based upon evidence of complainant's actual loss[.]" *United States v. Mine Workers*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). The government did not introduce any evidence as to its "actual losses" in the contempt hearing. Also, Bayshore was instructed to pay the fine to the court rather than to the government. Thus, the fine was not compensatory.

"The second kind [of fine for contempt] is payable to the court, but defendant can avoid paying the contempt 'fine' by performing the act required by the court's order." *Operation Rescue*, 919 F.2d at 868; *see Hicks*, 485 U.S. at 632, 108 S.Ct. at 1429. Bayshore could not avoid paying the fine. "The purpose of the fine, therefore, was to 'serve as a true deterrent,' *i.e.*, to

discourage [the defendant] from future violations." *Spindelfabrik*, 903 F.2d at 1579. Thus, the fine Bayshore was required to pay was criminal in nature.

■■ The government argues that both the parties and the court thought that the contempt proceeding was one for civil contempt and that this somehow determines the actual nature of the proceedings. A district court's characterization of a proceeding as either civil or criminal is not determinative. *TWM Mfg. v. Dura Corp.*, 722 F.2d 1261, 1270 n. 8 (6th Cir.1983) ("lower court's characterization of contempt proceedings is not determinative for purposes of appeal"), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986).

The First Circuit has held that, "[i]n deciding whether a proceeding before a lower court refers to civil or criminal contempt, the appellate court is required to look to the purpose and character of the sanctions imposed, rather than to the label given to the proceeding by the court below." *In Re Kave*, 760 F.2d 343, 351 (1st Cir.1985). We agree. *See also SEC v. Simpson*, 885 F.2d 390, 394, 398 (7th Cir.1989) (despite district's court's characterization of contempt sanctions as civil, because appellate court found that they were criminal, district court's decision was vacated); *cf. Shillitani v. United States*, 384 U.S. 364, 368–69, 86 S.Ct. 1531, 1534–35, 16 L.Ed.2d 622 (1966) ("[T]he character and purpose of these actions clearly render them civil rather than criminal contempt proceedings.... The fact that both the District Court and the Court of Appeals called petitioners' conduct 'criminal contempt' does not disturb our conclusion.")

■■ The government also argues that because Bayshore did not expressly object that the imposition of the fine was criminal and not civil, Bayshore has waived this argument on appeal. The government cites no authority for this proposition. Indeed, the district court's mischaracterization, contributed to by the government, is so problematical that the defendant never properly had notice of the type of proceeding to which it was subject and, thus, defendant's failure to object is not fatal. As the Supreme Court noted in *Hicks*, the "distinctions [between criminal and civil contempt] lead up to the fundamental proposition that criminal penalties *may not* be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings, including the requirement that the offense be proved beyond a reasonable doubt[.]" *Hicks*, 485 U.S. at 632, 108 S.Ct. at 1430 (emphasis added). *See Gompers*, 221 U.S. at 444, 31 S.Ct. at 499 ("[N]otwithstanding the many elements of similarity in procedure and in punishment, there are some differences between the two classes of proceedings which involve substantial rights and constitutional privileges. Without deciding what may be the rule in civil contempt, it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself."); *SEC v. Simpson*, 885 F.2d at 397 ("Providing the defendant with notice of the nature of the contempt proceedings and allowing him to prepare a defense also may allow the defendant to inform the court of extenuating circumstances that mitigate the effect of failure to comply with an order of the court."); *In Re Kave*, 760 F.2d at 351 (Alleged criminal contemnor entitled to notice "that he is criminally charged" and "is also protected by a presumption of innocence that can only be overcome by proof beyond a reasonable doubt.")

Since the fine was criminal in nature, the appropriate remedy is to vacate the district court's order. *See, e.g., Spindelfabrik*, 903 F.2d at 1580; *Gannett Outdoor Co. of Mich. v. Westland*, 875 F.2d 863 (6th Cir. 1989). Even though the April 12, 1989, order contained both criminal and civil sanctions, the two types of sanctions are severable. Thus, we vacate only that portion of the contempt order that is criminal, *i.e.*, that portion which required Bayshore to pay a $5,000 fine.

We AFFIRM, but VACATE the $5,000 fine.

WELLFORD, Senior Circuit Judge, concurring.

I concur in Judge Guy's well-reasoned analysis in this case. I write separately only to suggest that this case may come within the framework of *Carson v. American Brands*, 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). The *Carson* case involved an appeal from the refusal of a district court to enter a proposed consent decree which contained injunctive relief. In holding that the denial order was appealable and not merely interlocutory, *Carson* held that the "practical effect" of the district court's action was to refuse an injunction "which would have permanently enjoined" discrimination against a class of black plaintiffs. *Id.* at 83, 84, 101 S.Ct. at 996. The holding of appealability was to enable the litigants "to effectively challenge interlocutory orders of serious, perhaps irreparable, consequence. *Baltimore Contractors, Inc. v. Bodinger* [, 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1955) ]." The "predominant effect of the proposed decree would have been injunctive," and holding this rejection to be appealable would cause plaintiffs to "lose their opportunity to 'effectually challenge'" such denial. *Id.* at 84 n. 9, 86, 101 S.Ct. at 996 n. 9, 997. *Carson* made reference also to alleged "irreparable injury" because of the delay entailed by the district court order. *Id.* at 89, 101 S.Ct. at 999.

The order in the instant case, I believe, may well come within the meaning of *Carson* because the practical effect of the district court's order, although termed a temporary restraining order, when extended and accompanied by contempt holdings, was to grant permanent and serious relief against Bayshore. I agree with Judge Guy that "for all intents and purposes" the order in question was injunctive, but I am also inclined to feel that it may come within the *Carson* analysis, although the action in controversy in *Carson* dealt with a consent order, not a temporary restraining order, which was converted, in effect, into at least a temporary injunction.