United States Court of Appeals,

Fifth Circuit.

Nos. 95-30541, 95-30637.

The POLICE ASSOCIATION OF NEW ORLEANS, Through its President, Ronald J. CANNATELLA; Forrest Austin, Jr.; Albert Bowman; Kathleen Brown; Randall Chestnut; Roy Gibliant; Eric Hessler; Imbraguglio; Bedford Jones; Jerome Laviolette; Charles Little; Luther Lumpkin, III; Wesley Morris; Larry Nettles; Michael Nuessly; Leo Peters, Jr.; Elmon Randolph; Steven Smegal; Arthur Smock, III; Kenneth Solis; Michael Sposito; Brett Thorne; Frank Vaccarella; Keith Wehmeier; Gerald Young, Plaintiffs-Appellees,

v.

CITY OF NEW ORLEANS, etc., et al., Defendants,

City of New Orleans, a Louisiana municipality, Defendant-Appellant.

Larry WILLIAMS; Gustave Thomas; Willie Carter, Jr.; Edgar Morgan, Jr.; Ronal Bechet, Sr.; Patricia Lebeaux; Jeanne McGlory, On behalf of themselves and all others similarly situated, Plaintiffs-Appellees,

v.

CITY OF NEW ORLEANS, A Municipal Corporation, Defendant-Appellant,

and

Marc Morial, In his capacity as Mayor of New Orleans; Richard Pennington, As Superintendent of Police of New Orleans; New Orleans Civil Service Commission; Sidney H. Cates, IV, Chairman, New Orleans Civil Service Commission; Gerri M. Elie, Doctor; William R. Forrester, Jr.; Glenda Jones Harris; John P. Nelson, Commission Members, Defendants.

Dec. 9, 1996.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before WISDOM, EMILIO M. GARZA and PARKER, Circuit Judges.

WISDOM, Circuit Judge:

On May 27, 1987, the City of New Orleans agreed to a consent decree (the "Decree") with a class of African-American police officers (the "Williams Class") who contended that the promotion and hiring policies of the New Orleans Police Department (the "NOPD") were discriminatory. The Decree, which ended 14 years of protracted litigation, established a system to govern hiring and promotion within the NOPD.

In the first of these two consolidated cases, *Police Association of New Orleans [PANO] v.*

*City of New Orleans,* the PANO and 24 police officers who are not African-American assert that on December 31, 1993 the City made certain transfers and promotions in violation of the Decree and state and federal constitutional law. The district court found for the plaintiffs. In the second case, *Williams v. City of New Orleans,* the City appeals the district court's refusal to modify the terms of the Decree. For the reasons discussed below, we affirm the district court in the *PANO* case. We reverse the judgment of the district court refusing to modify the Decree in the *Williams* case. We vacate the district court's order holding the City in contempt, and remand for the entry of an order consistent with this opinion.

## I. BACKGROUND

The purpose of the Decree was to provide equal employment opportunity in the NOPD, to eliminate the effects of any past racial discrimination in the NOPD, and to improve citizen trust in and respect for the NOPD. The Decree altered the NOPD's promotion procedures in two meaningful ways.

First, the NOPD was required to establish and fund 30 sergeant, 12 lieutenant, and two captain positions that could be filled only by African-American officers. These positions, called "supernumeraries", represented a one-time affirmative action program. The Decree provides that vacant supernumerary positions may be filled only by African-American officers, subject to the condition that the NOPD may eliminate every fourth vacancy at its option. Aside from the requirement that only African-American officers fill the supernumerary positions, the terms and conditions of employment as a supernumerary are indistinguishable from those of regular officers of the same rank.

Second, the Decree created a "Band System" for promotions within the NOPD. Prior to the Decree, all officers seeking promotion who passed the New Orleans Civil Service Commission examination (the "examination") for that position were ranked in order of their scores and promoted in the order of their ranking. The Band System, by contrast, groups officers in bands according to their scores, so that all officers within a particular band are considered to have substantially equal ability.

The Decree requires the NOPD first to promote all officers within the lowest number band (comprised of officers having the highest test scores), then proceed to the higher number bands (comprised of officers with lower test scores). The Superintendent of Police must promote all officers in one band before proceeding to the next, but has discretion to select among the individuals within a particular band. The Decree mandated these changes in the promotion process to increase the opportunities for the advancement of African-American officers.

After the Decree was entered, a group of officers who are not African-American intervened to voice their objection to the creation of the supernumerary positions. The intervenors asserted that the Decree failed to insure that the ratio of regular sergeants, lieutenants, and captains to all officers in the NOPD would not fall below the ratio that exi sted on October 1, 1981. On that date, the proportion of ranked positions to all officers in the NOPD was as follows: 14.5 percent sergeants, 4.9 percent lieutenants, 1.8 percent captains. As a result, on May 27, 1987, the City and the Williams Class entered into a stipulation that addressed the intervenors' concerns. In the stipulation, the City agreed that the 1981 ratios would be maintained and that calculation of these ratios would not include the 44 supernumerary positions.

The most recent sergeant's promotional list was established in February 1991. By December 30, 1993 all officers in Bands 1, 2, 3, and 4 had been promoted. In Band 5 all African-American officers had been promoted and 34 non-African-American officers remained. Band 6 was comprised of both African-American and non-African-American officers. All 30 supernumerary sergeant positions were filled.

In November 1993, PANO informed the NOPD that it needed to create additional regular sergeant positions in order to comply with the stipulation. The City determined that the creation of 16 new regular sergeant positions would raise the ratio of regular sergeants to all officers above the 14.5 percent threshold requirement. Under the Decree, the new sergeants were to be selected from those officers remaining in Band 5. This action, however, would result in the promotion of non-African-American officers only. The City decided that, as a matter of policy, the promotions

should better reflect the racial demographics of the city's population.[1] To achieve this end, on December 31, 1993, the City transferred eight African-American supernumerary sergeants to eight of the newly created regular sergeant positions. The City then exercised its option to eliminate every fourth vacant supernumerary position as provided by the Decree. This left six vacant supernumerary positions. Because those positions could be filled by African-American officers only, the City passed over the 34 officers in Band 5 who were not African-American and promoted six African-American officers from Band 6. The City then filled the remaining ten newly created regular sergeant positions with ten of the non-African-American officers from Band 5, leaving 24 unpromoted. The net result of this scheme was 16 new sergeants: ten non-African-American officers from Band 5, and six African-American officers from Band 6.

On January 7, 1994, PANO and the 24 officers who were not African-American and were awaiting promotion to the rank of sergeant filed this action. Each of the individual officers had passed the sergeant examination and was placed in Band 5 of the Commission's promotional register. The plaintiffs asserted that, through the transfers and promotions of December 31, 1993, the City, the Superintendent of Police, and the Director of the Civil Service Commission violated the equal protection and due process clauses of the fourteenth amendment to the United States Constitution and Article I, Section 3 of the Louisiana Constitution of 1974. The plaintiffs asserted causes of action

---

[1]New Orleans is over 60 percent African-American. Superintendent Joseph Oricke testified that:

> [A]t the time the consent decree was signed, the number of supernumeraries that were promoted was based on the percentages of white and African-American officers on the job at that time. That percentage has changed since the signing of the consent decree and we were creating sixteen new positions that did not exist at the time the consent decree was sign [sic].

Additionally, Lynne Schackai, the Assistant Personnel Director of the Commission, testified that there was a concern about racial hostility within the NOPD, and that there was a belief that more African-American supervisors could better supervise African-American officers who, in turn, were needed to relate to the large African-American population in New Orleans. Michael Doyle, the Commission's Director of Personnel, testified that he "assumed" the transfer occurred because "they wanted to get some African-American officers". Leonard Simmons, the Commission's Chief Administrative Officer, testified that, at the time of the promotions, he was "very concerned that our rank in the police department ... did not reflect the constituency which it served".

under 42 U.S.C. § 1981 and 42 U.S.C. § 1983. The plaintiffs sought declaratory and injunctive relief, compensatory and punitive damages, and attorney's fees and costs.

Two of the 24 officers who were not African-American remaining in Band 5 contended that they were denied promotions because they maintained their "residence" as opposed to their "domicile" in Orleans Parish.[2] These officers asserted that Municipal Ordinance 15420, which required all city employees to be domiciled in Orleans Parish in order to be eligible for promotion, violated an express provision of the Decree. Paragraph X of the Decree provides:

> In accordance with present law, no applicant for Police Recruit shall be hired by the NOPD unless he or she is a resident of the Parish of Orleans. In order to be eligible for promotion to the ranks of Police Sergeant, Police Lieutenant, Police Captain or Police Major, an officer shall establish that his or her residence is in the Parish of Orleans, unless he or she can show that this requirement was waived as to him or her and that such waiver is still in effect.

The parties agreed that this case did not involve any disputed issues of fact, but rather turned solely upon interpretation of federal constitutional and statutory law and the Decree. All parties agreed that the district court should resolve the dispute based on trial memoranda submitted by counsel for all parties.

On April 4, 1995, the district court issued a Memorandum and Order finding specifically: (1) the transfers and promotions made by the City on December 31, 1993 violate the Decree and the Equal Protection Clause of the Fourteenth Amendment, (2) the City violated 42 U.S.C. § 1981 and 42 U.S.C. § 1983 with respect to each of the individual plaintiffs, and (3) Municipal Ordinance 15420

---

[2]The Louisiana Supreme Court has explained the distinction between domicile and residence:

> Domicile and residence are two separate concepts. Domicile includes residence but it also includes the added element of an intent to make the residence one's principal establishment. A person can have several places of residence but only on place of domicile.

*Gowins v. Gowins,* 466 So.2d 32, 34 (La.1985) (citation omitted). The Louisiana Civil Code provides:

> The domicile of each citizen is in the parish wherein he has his principal establishment.

> The principal establishment is that in which he makes his habitual residence....

La.Civ.Code Ann. art 38 (West 1993).

and its successor Ordinance 16923 conflict with the Decree and, therefore, cannot be applied to NOPD officers. Because there were alternative courses of action by which the City could remedy the violations and comply with the order, the district court gave the City an opportunity to fashion a remedy to correct the violations of the Decree and federal statutory and constitutional law by May 1, 1995.

On May 1, the City had not complied with the April 4 order, but instead presented a proposed remedy to the district court. On May 1, the City also filed a motion to amend the Decree to require "domicile" rather than "residency" for promotions within the NOPD. On May 15, the district court, after a hearing on the proposed remedy, found that it was unsatisfactory because the City continued to apply a domiciliary requirement to the officers waiting for promotion. The district court found that the City ignored the district court's finding that the domiciliary requirement violated the Decree and held the City in contempt. The district court ordered the City to pay a fine of $5,000 a day until the City effectuated a remedy in compliance with the April 4 order and the Decree. On the same day, the City filed a motion to stay the contempt order and an alternative motion for clarification and reconsideration of the April 4 order. On May 17, the district court denied the City's motion to amend the consent decree. On May 18, the district court denied the City's motion to stay the contempt order and the motion for clarification or reconsideration of the April 4 order.

On May 30, 1995, the City filed a Notice of Appeal from (1) the April 4 order, (2) the order of contempt issued by the district court on May 15, and (3) the order denying the City's motion to stay and the motion for clarification or reconsideration issued on May 18. On June 14, 1995, the City filed a separate Notice of Appeal from the order denying the City's motion to amend the Decree.

On June 2, 1995, the City filed a motion to set aside the contempt order and provided the court with a second proposed remedy, the promotion of the eight non-African-American officers in Band 5, conditioned upon a reserved right to return the officers to their former positions if the City prevailed on its appeal of the district court's April 4 order. The district court held a hearing on June 7. The court found that the second proposed remedy was unsatisfactory because neither the Decree nor the New Orleans Civil Service Rules provide for this type of "conditional promotion". The

district court denied the City's motion to set aside the contempt order, and specified a remedy—the unconditional promotion of all the officers remaining in Band 5 effective retroactively to March 3, 1995.

On June 7, 1995, the City filed a second motion to set aside the contempt order. The motion stated that all officers remaining in Band 5 had been promoted in accordance with the court's order. On June 12, the district court held a hearing on this motion. The district court found the City in substantial compliance with its June 7 order. The court ordered the City purged of contempt retroactively to June 7, on the condition that the City provide documentary evidence by June 13, 1995 of the promotions of each of the 24 non-African-American officers. At the June 12 hearing the district court also amended its June 7 order to provide that all these promotions be effective retroactively to December 31, 1993. On June 13, the City provided the required documentary support. At a hearing on June 14, the district court found that the City had complied with its orders and set aside the contempt order, retroactive to June 7. The district court also adjusted the retroactive promotion date of the 24 non-African-American officers to place them on par with the six African-American officers illegally promoted to sergeant on December 31, 1993. On July 6, the City filed an Amended Notice of Appeal from the district court's orders of June 7, June 14, and June 21. The Amended Notice of Appeal also included notice of appeal from the three orders that were the subject of the City's May 30, 1995 Notice of Appeal.

## II. APPELLATE JURISDICTION

The April 4, June 7, and June 21 orders, taken together, have the practical effect of granting an injunction.[3] We therefore exercise jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).[4] The definition

---

[3]*See Laje v. R.E. Thomason Gen. Hosp.,* 564 F.2d 1159, 1161 (5th Cir.1977) (Holding that interlocutory order to grant a doctor staff privileges during the pendency of the action was appealable under § 1292(a)(1) because it "was in the nature of an injunction".); *Schulner v. Jack Eckerd Corp.,* 706 F.2d 1113, 1114 (11th Cir.1983) (Holding that an order to reinstate employee pending determination of damages was appealable under § 1292(a)(1) because it "was in the nature of an injunction".).

[4]28 U.S.C. § 1292 provides in relevant part:

(a) [T]he courts of appeals shall have jurisdiction of appeals from:

of an injunction under § 1292 is broad.  That section applies to "[o]rders that are directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought in the complaint in more than a temporary fashion."[5]  The orders appealed satisfy this definition:  they were directed to the City, enforced by contempt, and permanently granted virtually all of the substantive relief sought by the plaintiffs.  Thus, the orders have the practical effect of granting an injunction.  The Supreme Court has held, however, that for an order to be appealable under § 1292(a)(1), the litigant must also show that the order having the effect of an injunction causes serious, perhaps irreparable, consequences.[6]  In this case, the unconditional retroactive promotion of police officers to the rank of sergeant is such an irreparable consequence.  This Court, therefore, has appellate jurisdiction over these orders.

Our conclusion that appellate jurisdiction exists over the orders having the practical effect of an injunction is a prerequisite to our consideration of the plaintiff's challenge to the district court's contempt order because "a judgment of civil contempt is not a final decree and therefore is not appealable in itself.  However, where the validity of the underlying order or injunction is questioned on appeal there may also be an appeal of a remedial contempt order."[7]

The district court's May 17, 1995 order denying the plaintiff's motion to amend the Decree is the court's final judgment with regard to the attempted amendment and is, therefore, appealable under 28 U.S.C. § 1291.

---

> (1) Interlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions....

[5]16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER & EUGENE GRESSMAN, FEDERAL PRACTICE AND PROCEDURE:  Jurisdiction § 3922, at 29 (1977);  (*quoted in Santana Products v. Compression Polymers,* 8 F.3d 152, 154 (3rd Cir.1993);  *I.A.M. Nat. Pension Fund v. Cooper Industries, Inc.,* 789 F.2d 21, 24 (D.C.Cir.1986);  *United States v. Western Electric Co.,* 777 F.2d 23, 28 n. 12 (D.C.Cir.1985)).

[6]*Carson v. American Brands, Inc.,* 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59.

[7]*Blaylock v. Cheker Oil Co.,* 547 F.2d 962, 965 (6th Cir.1976) (*quoted in Western Water Management, Inc. v. Brown,* 40 F.3d 105, 108 n. 1 (5th Cir.1994);  *United States v. Bayshore Associates, Inc.,* 934 F.2d 1391, 1398 (6th Cir.1991);  *Mercury Motor Express, Inc. v. Brinke,* 475 F.2d 1086, 1091 (5th Cir.1973)).

III. DISCUSSION

*Municipal Ordinance 16923*

Two of the plaintiffs in this case were passed over for promotion in 1993 because they were not domiciled in Orleans Parish, as required by Municipal Ordinance 15420. This ordinance contained a "grandfather clause", which the Louisiana Supreme Court in 1995 held to be unconstitutional.[8] In response to this decision, the City adopted a similar ordinance, Municipal Ordinance 16923, containing no "grandfather clause". This ordinance provides that any employee domiciled outside Orleans Parish on February 16, 1995 will not be terminated, but that from that date on, no city employee is eligible for promotion unless the employee establishes domicile in Orleans Parish. The district court found that Ordinance 15420 and its successor 16923 conflicted with an express provision in the Decree that required only residency for promotion. Therefore, the district court ruled that the NOPD had improperly applied Ordinance 15420 to deny promotions in the past, and that any future application of Ordinance 16923 to promotions would also be improper. We agree with the district court's conclusion.

The Decree was entered before the passage of the Municipal Ordinance 16923. Until the Decree is amended or expires it binds the City as to promotional requirements within the NOPD. The City cannot unilaterally amend the bargain struck in the Decree through the passage of a municipal ordinance.

*The Equal Protection Clause of the Fourteenth Amendment*

The district court found that the City's actions also violated the equal protection clause of the fourteenth amendment to the United States Constitution. We agree.

The equal protection clause provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."[9] The Supreme Court has stated that the "rights created by the first section of the fourteenth amendment are, by its terms, guaranteed to the individual. The

---

[8]*Police Association of New Orleans v. City of New Orleans,* 649 So.2d 951, 956-57 (La.1995).

[9]U.S. Const.Amend. XIV, § 1.

rights established are personal rights."[10]  "Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees."[11]  In *City of Richmond v. J.A. Croson Co.,* the Supreme Court held that, to be constitutional, racial classifications in affirmative action programs must withstand the exacting standards of strict scrutiny.[12]  Application of strict scrutiny involves two distinct inquiries.  First, any racial classification must be justified by a compelling state interest.[13]  Second, the means used by the state to accomplish its purpose must be "narrowly tailored to the achievement of that goal".[14]  For the reasons that follow, we hold that City's actions were not constitutional.

Since the Court's decision in *Croson,* circuit courts have labored to determine what characteristics a plan of racial preference must possess to be "narrowly tailored" or to achieve a "compelling governmental interest".[15]  While *Croson* does not require a city to incriminate itself by

---

[10]*Shelley v. Kraemer,* 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948).

[11]*Fullilove v. Klutznick,* 448 U.S. 448, 491, 100 S.Ct. 2758, 2781, 65 L.Ed.2d 902 (1980).

[12]488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989);  *See also* Laurence H. Tribe, Joint Statement, *Constitutional Scholar's Statement on Affirmative Action After City of Richmond v. J.A. Croson Co.,* 98 YALE L.J. 1711 (1989);  Diane E. Dixon, *The Dismantling of Affirmative Action Programs:  Evaluating City of Richmond v. J.A. Croson Co.,* 7 N.Y.L.SCH.J.HUM.RTS. 35 (1990);  Cassandra D. Hart, *Unresolved Tensions:  The Croson Decision,* 7 HARV.BLACKLETTER J. 71 (1990);  Douglas D. Scherer, *Affirmative Action Doctrine and the Conflicting Messages of Croson,* 38 U.KAN.L.REV. 281 (1990);  Kathleen M. Sullivan, *City of Richmond v. J.A. Croson Co.:  The Backlash Against Affirmative Action,* 64 TUL.L.REV. 1609 (1990).  *See also* RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE & PROCEDURE § 18.10 (2d Ed.1992).

[13]*Wygant v. Jackson Board of Education,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1989).

[14]*Fullilove,* 448 U.S. at 480, 100 S.Ct. at 2776.

[15]*See O'Donnell Constr. Co. v. Dist. of Columbia,* 963 F.2d 420 (D.C.Cir.1992);  *Stuart v. Roache,* 951 F.2d 446 (1st Cir.1991);  *Harrison & Burrows Bridge Constructors v. Cuomo,* 981 F.2d 50 (2d Cir.1992);  *Contractors Ass'n of Eastern Penn. v. City of Philadelphia,* 91 F.3d 586 (3d Cir.1996);  *Alexander v. Estepp,* 95 F.3d 312 (4th Cir.1996);  *Middleton v. City of Flint,* 92 F.3d 396 (6th Cir.1996);  *Billish v. City of Chicago,* 989 F.2d 890 (7th Cir.1993) (en banc); *Donaghy v. City of Omaha,* 933 F.2d 1448 (8th Cir.1991);  *Associated General Contractors of California v. City and County of San Francisco,* 950 F.2d 1401 (9th Cir.1991);  *Adarand Constructors Inc. v. Pena,* 16 F.3d 1537 (10th Cir.1994);  *Cone Corporation v. Hillsborough County,* 908 F.2d 908 (11th Cir.1990);  Nicole Duncan, *Croson Revisited:  A Legacy of Uncertainty in the Application of Strict Scrutiny,* 26 COLUM.HUM.RTS.L.REV. 679 (1995).

proving its own participation in past discrimination, Justice O'Connor did require a showing of at least passive involvement in past discrimination.[16] The Court offered little guidance, however, as to how much proof is required. This Court has addressed this issue on several occasions.

In *Black Fire Fighters Association v. City of Dallas,*[17] the city and the Black Fire Fighters Association sought approval of a settlement of an employment discrimination action. The Dallas Fire Fighters Association intervened to oppose the settlement. After examining the "skip promotion" system, a panel of this Court held that the system violated the equal protection clause. In *Edwards v. City of Houston,*[18] associations representing various members of a police department sought to intervene in a consent decree entered into by the city and a class of African-American and Hispanic police officers. There, we held that the plan instituted by the consent decree did not violate the equal protection clause. Finally, in *Hopwood v. State of Texas,* this Court assessed the constitutionality of an affirmative action admissions policy at the University of Texas School of Law. There, we found that the use of race as a factor in the school's admissions policy was violative of the equal protection clause.

Unlike the cases discussed above, this case does not require us to conduct an examination of evidence of past discrimination. We need not assess any plan offered by the City to determine whether it is "narrowly tailored". We cannot conduct such analysis because we have no plan before us, nor any specific evidence of past discrimination.

The City contends that the promotions and transfers were made to give a better reflection of the racial composition of the city; "more African-American supervisors could better supervise African-American officers who in turn were needed to relate to the larger African-American population".[19] Notwithstanding the validity of the City's goal, this alone does not justify a racial

---

[16]*Croson,* 488 U.S. at 492, 109 S.Ct. at 720-21.

[17]19 F.3d 992 (5th Cir.1994).

[18]37 F.3d 1097 (5th Cir.1994).

[19]Deposition of Lynne Schackai, Assistant Personnel Director of the New Orleans Civil Service Commission.

classification. Rather, under *Croson* and its progenitors, an affirmative action plan must be narrowly tailored to remedy past specific instances of discrimination.[20] The City has introduced no evidence of specific past discrimination that it was attempting to remedy with the instant promotions.

To the extent that the City offers the Decree itself as a finding of past discrimination, its assertion similarly fails. We recognize that, in the present case, the City was attempting to remedy racial imbalances in the police department. We further understand that this was also the purpose of the Decree. Nonetheless, if the Decree was not meeting its purpose, the City should have petitioned the court to modify the Decree. It is settled that, to the extent a decree is drafted to deal with events in the future, the court must remain continually willing to modify the order to ensure that it accomplishes its intended result.[21] Further, a court must never overlook substantial changes in the circumstances surrounding a decree, lest it become an "instrument of wrong".[22] The City failed to seek modification of the Decree prior to the promotions, and has offered no explanation for its failure. Notwithstanding demographic changes or the City's benevolent intent, modification is the only proper course and, fatally, a course the City failed to pursue. The Decree cannot be used to justify actions aside from those mandated by its own terms. Rather, the City must make specific findings, independent of the Decree, to support the actions before us. The City has not done so. As such, although the promotions based on race were made with a laudable goal in mind, we cannot hold that they were in furtherance of a compelling state purpose under *Croson.*

Even assuming that the promotions were made to remedy specific past discrimination, the actions before us were not narrowly tailored, as required under the second prong of our equal protection analysis. If the promotions and transfers of December 31, 1995 were approved, the power of the City to transfer supernumeraries out of those positions and fill them with more African-

---

[20]*Bakke,* 438 U.S. 265, 307-10, 98 S.Ct. 2733, 2757-59, 57 L.Ed.2d 750.

[21]*United States v. United Shoe Mach. Corp.,* 391 U.S. 244, 252, 88 S.Ct. 1496, 1501, 20 L.Ed.2d 562 (1968); *Exxon Corp. v. Texas Motor Exchange of Houston,* 628 F.2d 500, 503 (5th Cir.1980).

[22]*United States v. Swift & Co.,* 286 U.S. 106, 115, 52 S.Ct. 460, 462-63, 76 L.Ed. 999 (1932).

American officers would be unlimited. Such a policy would severely enervate the Band System and deprive the police force and the general population of the fundamental benefits of the Decree.

Because the race based promotions were not in furtherance of a compelling state purpose and were not narrowly tailored, the City's actions violated the equal protection clause of the fourteenth amendment.

*The Decree*

The City transferred officers from the supernumerary positions to regular sergeant positions in an attempt to comply with the Stipulation. The vacant supernumerary positions were then filled with African-American officers from Band 6, leaving 24 non-African-American officers in Band 5. Although the City maintains that this procedure was consistent with the Decree, the district court found that the transfer of the eight supernumerary sergeants to regular sergeant positions and the related promotion of six African-American officers from Band 6 violated the Decree. We agree with the district court.

The Decree included a color-blind provision prohibiting unlawful discrimination within the NOPD:

> Defendants ... shall not engage in any act, practice, or policy which has the purpose or effect of unlawfully discriminating on the basis of race or color against any employee or applicant for employment in the New Orleans Police Department.

The City's unlawful discrimination violated this express provision of the Decree.

The City's transfer of the supernumeraries to regular sergeant positions also violated the promotional scheme set out by the Decree. The Decree provides that, in filling regular sergeant positions, "[p]romotions shall *first* be made from the group with the highest scores [Band 1], then from the group with the second highest scores [Band 2], and so forth until the list expires". In this case, rather than promote the available officers in Band 5, the City filled the vacant regular sergeant positions with supernumeraries. This is in direct conflict with the Decree.

The City contends that, because the transferred supernumerary sergeants were originally in Band 5, the promotions were actually made from the highest available band. This is a meritless contention. It is undisputed that there is no difference between supernumerary and regular sergeant

positions with respect to any condition of employment. As such, it cannot be argued that supernumerary sergeants retain their pre-promotion band levels for eventual "promotion" into regular sergeant positions. If the positions are the same, the only conceivable reason for the "promotion" of the supernumeraries is to circumvent the express terms of the Decree.

Finally, the City insists that the New Orleans Civil Service Rules permit the "transfer" of employees into vacant positions as they come open.[23] Such rules do not overcome the direct language of a judicial decree.

As a policy matter, if we accept the City's argument that its actions were in accordance with the Decree, each time a regular sergeant position became vacant, the City could transfer a African-American officer from a supernumerary position and then promote the next available African-American officer into the vacated supernumerary position. As the district court poi nted out, this construction of the Decree would eviscerate the Band System and would give the City unchecked authority to promote African-American officers to the exclusion of all others.

*Section 1983*

The district court also found that the City's actions violated 42 U.S.C. § 1983. That section provides:

> Every person who, under color of [state law], subjects or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.[24]

Having concluded that the constitutional rights of the plaintiffs were violated, it remains only to determine whether the City is a "person" within the meaning of § 1983.

---

[23]Rule VI provides in pertinent part:

> An employee may be transferred from any position in the classified service to any other position of the same class, or of any other class for which no additional or different qualifications are prescribed for original entrance, on recommendation of the appointing authority and approval of such transfer by the Director, but no employee shall be transferred from a position in one organization unit to a position in another organization unit without the consent of the appointing authorities of both units concerned.

[24]42 U.S.C. § 1983 (West 1994).

The Supreme Court has held that a municipality may be liable under § 1983.[25] This liability, however, may not be based on a theory of respondeat superior. Rather, local governmental liability is triggered where the "execution of a government's policy or custom, whether made by its law makers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury ...".[26] "Municipal liability attaches only where the decision maker possessed final authority to establish municipal policy with respect to the action ordered."[27]

The evidence in the present case indicates that the Mayor, the Chief Administrative Officer, and the Superintendent of Police each knew of and approved the transfers and promotions. The final decision was made by the Superintendent, who is ultimately responsible for promotions in the NOPD. Further, the Director of the Civil Service Commission approved the promotions and transfers. Given these facts, there is little question that municipal liability may attach in this case. Accordingly, because we find that the City's actions unlawfully discriminated against the plaintiffs in contravention of the Equal Protection Clause, we hold that the City violated § 1983.

*Section 1981*

42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts.... The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law".[28] Although the statute speaks explicitly of "contracts", the Supreme Court has held that an employer's failure to promote an employee because of the employee's race is actionable under § 1981.[29] The Court cautioned, however, that the action is proper only when

---

[25]*Monell v. Department of Social Services,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978).

[26]436 U.S. at 694, 98 S.Ct. at 2037-38.

[27]*Pembauer v. City of Cincinatti,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1299-1300, 89 L.Ed.2d 452 (1986).

[28]42 U.S.C. § 1981 (West 1994).

[29]*Patterson v. McLean Credit Union,* 491 U.S. 164, 185, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989).

the promotion "rises to the level of an opportunity for a new and distinct relation between the employee and the employer".[30] Hence, the primary inquiry under this cause of action is whether a promotion to sergeant, which the plaintiffs were denied, would have amounted to a new and distinct relation between the plaintiffs and the NOPD.

In deciding whether a change of position rises to the level of a new and distinct relation, the court must compare the employee's current duties, salary, and benefits with those incident to the new position.[31] If the new position involves substantial changes in these areas, a new and distinct relation is recognized. Examples of such changes abound. A promotion from associate to partner in a law firm is the sort of promotion that constitutes a new and distinct employment relationship.[32] Denial of a promotion from billing clerk to supervisor, similarly, may be actionable under § 1981.[33] If, however, there is little change between the current and contemplated positions, § 1981 is inapplicable.[34]

Sergeants in the NOPD carry supervisory duties not shouldered by regular officers. This heightened responsibility is rewarded with higher salary and enhanced eligibility for further promotion. We find that this is the type of change in relation between employee and employer that, if denied based o n race, triggers the application of § 1981. Because we have determined that the promotions were denied based on unlawful discrimination, we conclude that the City's actions violate § 1981.

*The City's Motion to Amend the Consent Decree.*

In its April 4 order, the district court found that Municipal Ordinance 15420 and its successor Ordinance 16923 conflicted with an express provision in the Decree and held that the ordinance could not be applied to NOPD officers. On May 1, the City moved the district court to amend Paragraph

---

[30]*Id.*

[31]*Harrison v. Associates Corp. of North America,* 917 F.2d 195, 198 (5th Cir.1990).

[32]*Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

[33]*Mallory v. Booth Refrigeration Supply Co., Inc.,* 882 F.2d 908 (4th Cir.1989).

[34]*Harrison,* 917 F.2d at 199.

X of the Decree to substitute a requirement of domicile for the existing requirement of residency. On May 17, the district court denied the motion because the "City failed to establish that a significant change in facts or law warrants revision of the Decree". The City argues that it was unnecessary to show such a change because: (1) the motion was unopposed, (2) the motion did not seek to alter an essential provision of the decree, and (3) the modification would not adversely impact the remedial purpose of the Decree.

This Court reviews decisions regarding modification of consent decrees for abuse of discretion.[35] In 1992, the Supreme Court issued *Rufo v. Inmates of Suffolk County Jail,*[36] in which the court set forth a new "flexible standard" for considering requests to modify consent decrees stemming from institutional reform litigation. Under the *Rufo* standard, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree".[37] The Court went on to explain, however, that:

> The standard we set forth applies when a party seeks modification of a term of a consent decree that arguably relates to the vindication of a constitutional right. Such a showing is not necessary to implement minor changes in extraneous details that may have been included in a decree ... but are unrelated to remedying the underlying constitutional violation. Ordinarily, the parties should consent to modifying a decree to allow such changes. If a party refuses to consent and the moving party has a reasonable basis for its request, the court should modify the decree.[38]

In this case, the amendment sought is not related to the primary purpose of the Decree—equal employment opportunity in the NOPD. Rather, Paragraph X is a minor provision of the Decree. Paragraph X was included to assure that the Decree would not be interpreted to create an exception to the city's generally applicable employment requirements. Those requirements have been amended to require that all city employees maintain their domicile in Orleans Parish to be eligible for

---

[35]*Elgin National Watch Co. v. Barrett,* 213 F.2d 776, 780 (5th Cir.1954).

[36]502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

[37]*Id.* at 383, 112 S.Ct. 748 at 759-60.

[38]*Id.* at n. 7, 112 S.Ct. 748, at n. 7.

promotion. The constitutionality of such a requirement has been consistently upheld.[39] The City has a strong interest in requiring its employees to maintain a domicile in Orleans Parish.[40] The City has a reasonable basis for seeking the amendment to the Decree—uniformity of employment requirements for all city employees. The plaintiffs did not oppose the amendment. Accordingly, we find that, under the flexible standard articulated in *Rufo,* the district court's denial of the City's motion to amend the Decree was an abuse of discretion.

*Contempt Order*

We review a contempt order for abuse of discretion.[41] In this case the City was held in contempt for applying Municipal Ordinance 16923 to the NOPD officers in clear contravention of the district court's April 4 order. The City argues that this was an abuse of discretion because the order was ambiguous, or, alternatively, because the City substantially complied with the order.

In the April 4, 1995 order the district court specifically found:

(1) that the transfers and promotions made by the City on December 31, 1993 violate the Consent Decree entered into by the City on May 27, 1987 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution,

(2) that the City violated 42 U.S.C. § 1981 and 42 U.S.C. 1983 with respect to each of the plaintiffs, and

(3) that Municipal Ordinance 16923 directly conflicts with the Decree and is not applicable to NOPD officers.

The district court then ordered the City to "remedy the violations of the Consent Decree and federal statutory and constitutional law in accordance with this Order not later than May 1, 1995".

The City asserts that this directive is vague and ambiguous, and therefore cannot be a basis for contempt. The City relies on *Longshoreman's Association v. Marine Trade Association,*[42] in which the Supreme Court held that a finding of contempt cannot be predicated upon an

---

[39]*See, e.g., McCarthy v. Philadelphia Civil Service Comm'n,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976); *Police Association of New Orleans v. City of New Orleans,* 649 So.2d 951 (La.1995).

[40]*Police Association of New Orleans v. City of New Orleans,* 649 So.2d 951, 963 (La.1995).

[41]*Federal Deposit Insurance Corporation v. LeGrand,* 43 F.3d 163, 166 (5th Cir.1995).

[42]389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967).

"unintelligible" order or "a command that defies comprehension".[43] The district court's April 4, 1995 order is not such a command. Although it is true that the district court's order does not specify a remedy, this lack of specificity was intentional. The district court reasoned:

> The City struck a bargain in May of 1987 and it is the duty of the elected and duly appointed officials to carry out the obligations to which they are bound by the Consent Decree. The Court's role is to determine whether the City's promotional decisions comport with the Decree and federal law. I have found that they do not. While it is within my power to do so, the principles of federalism and comity as well as common sense dictate that I should not attempt the task of selecting the individuals best qualified for promotion or demotion in the NOPD. In keeping with that policy I find it more appropriate for the City to provide a remedy consistent with this Order.

The district court's well-reasoned order clearly states the court's reasons for not specifying a remedy on April 4. The court struck a balance. The order was sufficiently definite, but the court declined to unduly interfere with NOPD promotion procedures. In these circumstances, we find that the district court's order supported the finding of contempt.

The City argues that the district court abused its discretion in finding the City in contempt because the City had substantially complied with the April 4 order. This argument is without merit. From the testimony of Marlin Gusman, Chief Administrative Officer for the City, it is clear that the City understood that the order found the domiciliary requirement of Municipal Ordinance 16923 inapplicable to NOPD officers. The City, however, decided to apply the domiciliary requirement in contravention of the order. Although the City had moved the district court to amend the Decree, the law of the case on May 15, 1995 was clear. The City was not entitled to disregard the district court's clear mandate in reliance on a proposed amendment to the Decree. Because the City continued to apply Municipal Ordinance 16923 in clear contravention of the district court's order, the City had not substantially complied with the order and the finding of contempt was proper.

## IV. CONCLUSION

In sum, we find that the district court correctly determined that the City's transfers and promotions of December 31, 1993 violate the Decree and the equal protection clause of the fourteenth amendment to the United States Constitution. We find, further, that the constitutional

---

[43]*Id.* at 76, 88 S.Ct. 201, at 208.

violations entitle the plaintiffs to relief under 42 U.S.C. § 1981 and 42 U.S.C. § 1983.  Accordingly, in these respects, the judgment of the district court is AFFIRMED.

Although we hold that the district court properly found the City in contempt on May 15, 1995 for failure to comply with the April 4, 1995 order, we also find that the district court erred on May 17, 1995 by refusing to amend the Decree to mirror the domiciliary requirement of Municipal Ordinance 16923.  Had the court properly granted the motion to amend the Decree, the City's proposed remedy would have been in accordance with the Decree and the April 4 order as of that date.  We find, therefore, that the City may properly be held in contempt for May 15, 1995 and May 16, 1995 only.  Accordingly, we VACATE the district court's contempt order and REMAND to the district court for entry of an order consistent with this opinion.