IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 28, 2009

Charles R. Fulbruge III
Clerk

No. 08-50241

WAYNE SPECHT

Plaintiff - Appellee

v.

MAXIMUS INC

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:07-CV-192

Before JONES, Chief Judge, and STEWART and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Maximus, Inc. appeals the district court's grant of summary judgment in favor of Wayne Specht on his breach of contract claim. Maximus contends that the court erred in granting summary judgment on an issue not raised by the parties, that fact questions exist regarding whether it waived a condition precedent to contract enforcement, and that the court misinterpreted the contract term at issue. Because we conclude that genuine issues of fact exist

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

precluding summary judgment, we REVERSE and REMAND for further proceedings.

## I. BACKGROUND

In 2003, Wayne Specht began working as a State Marketing Executive for Maximus, Inc. in one of its business marketing divisions called the Capital Cities Group. Specht's primary job was to identify and develop business opportunities for Maximus with the Texas state government. Specht received a base salary for his work and could additionally receive a commission on certain opportunities he created. The Capital Cities commission plan was outlined in "Goal Letters" that were part of Specht's annual performance review. Specht's 2004 and 2005 Goal Letters each stated, "NO commission payments will be made without the approval of the appropriate division(s) and/or group(s) using the 'Opportunity Approval Request.'"[1]

In February and March 2004, Specht identified an opportunity for Maximus with the Texas Health and Human Services Commission. Specht prepared an Opportunity Approval Request ("OAR") for this potential project. The OAR was submitted on a standard company form. Thereon, Specht described the opportunity as follows:

---

[1] More fully, the 2005 Goal Letter, which was virtually identical to the 2004 description of the commission plan, provided this:

The commission plan is defined as follows for all opportunities that you pursue with the approval/concurrence of the appropriate division(s) and/or group(s):

- Commission rate/factor is 1.25%
- Commissions are paid on MAXIMUS labor/services and software
- Commissions are paid quarterly based on cash receipts
- NO commission payments will be made without the approval of the appropriate division(s) and/or group(s) using the "Opportunity Approval Request"
- NO commission payments will be made if you decide to voluntarily leave MAXIMUS or transfer outside the Corporate Marketing organization (All commission payments will stop at that time.)
- Commission payments associated with a given contract will NOT exceed $300K

> The Texas Health and Human Services Commission (HHSC) shall establish at least one but not more than four call centers for the purposes of determining and certifying or recertifying a person's eligibility and need for services related to the State's Medicaid, Food Stamps, TANF, and Long-term Care. The commission will also establish automated tools to support on-line screening, application, and eligibility in coordination with the Texas Integrated Eligibility Redesign System (TIERS).

The OAR further stated that the capture team would be comprised of Health Services – Health Systems as the "[l]ead division" and that "[o]ther divisions that may be involved" included "Human Services – Human Services Operations (Eligibility Determination / Call Center expertise), Technical Services – Technology Support." The OAR listed Specht's "projected role" in pursuing the opportunity as "Capture Plan manager, strategy and solution development, teaming partners lead, proposal development." Finally, the OAR form contained the following preprinted note below the designated space for approval signatures: "By indicating your approval, you are agreeing to pursue the subject opportunity. You are also acknowledging your willingness to pay commissions in accordance with the Capital Cities compensation plan if a contract is awarded."

Jack Ginsburg, the Vice President of Corporate Marketing and Business Development and Specht's direct supervisor, signed the form, as did John Lau, the President of the Health Services – Health Systems division. Maximus pursed the opportunity, which became known as the "Texas Integrated Eligibility and Enrollment" project ("Texas IEE"). Specht continued to work on the project. Maximus decided to partner with Accenture LLP. Maximus and Accenture eventually signed a five-year contract with the Texas Health and Human Services Commission in June 2005. Accenture would serve as the primary contractor with the state, and Maximus would be the primary

subcontractor. The total contract was for $899 million. Maximus reported $370 million as its portion of that award.

Despite its ultimate success, Maximus declined to pay Specht any commission on the project, asserting that Specht failed to get "the approval of the appropriate division(s) and/or group(s)," a condition precedent for payment of the commission. Maximus alleged that Specht failed to secure the required approval signatures from all Maximus divisions or groups with profit or loss responsibilities for the project. Maximus eventually eliminated Specht's position and terminated him.

Specht then sued Maximus for $300,000, the maximum commission for any single project. The district court granted summary judgment in favor of Specht, concluding that Maximus waived any requirement that Specht obtain additional approvals by pursuing the OAR as written and, alternatively, that Specht had all necessary signatures on the form. Maximus filed motions for a new trial and to stay enforcement of the judgment, arguing that the district court had no power to enter summary judgment based on waiver, a ground not raised by Specht. The district court denied both motions. Maximus timely appealed.

## II. DISCUSSION

We submit a district court's summary judgment ruling to *de novo* review, applying the same standard as the district court. *Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 645 (5th Cir. 2008). Summary judgment is proper when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In evaluating the existence of a genuine issue of material fact, we review the evidence and inferences drawn from that evidence in the light most favorable to

the non-moving party." *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 537 (5th Cir. 2007).

## A. Waiver

The district court granted summary judgment for Specht based on waiver, holding that regardless of whether Specht received approval from the appropriate divisions or groups, Maximus waived the requirement that he do so "by its conduct in pursuing the OAR as written by Specht and using Specht's services in the subsequent negotiations to secure the contract." The court explained that these actions were inconsistent with an intention to require additional approvals as a prerequisite to commission payment. It therefore waived the approvals. Moreover, the court determined that Maximus's "silence on the approval issue, coupled with its intentional pursuit of the Texas Eligibility project, misled Specht to his detriment." Maximus was therefore required to pay Specht his commission.

Maximus argues that the district court erred both procedurally and substantively. First, Specht did not plead waiver before the district court. The district court found waiver *sua sponte* without giving Maximus the required ten-day notice. Second, even if the district court appropriately ruled on waiver, genuine issues of material fact exist regarding whether Maximus waived its right to additional approvals. We will examine each alleged error in turn.

### 1. Procedural Error

A district court may enter summary judgment *sua sponte* if it provides the losing party with ten days' notice to come forward with evidence in opposition. *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 770–71 (5th Cir. 2000); *Washington v. Resolution Trust Corp.*, 68 F.3d 935, 939 (5th Cir. 1995). Although Rule 56's ten-day notice requirement is strictly interpreted, the failure to provide such notice is reviewed for harmless error. *Love*, 230 F.3d at 771. The error "is harmless if the nonmoving party admits that he has no additional evidence anyway or if

. . . the appellate court evaluates all of the nonmoving party's additional evidence and finds no genuine issue of material fact." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1398 (5th Cir. 1994).

Maximus maintains that Specht never raised the issue of waiver in his pleadings, and the district court improperly granted summary judgment on that basis without giving Maximus the required ten days' notice to submit an opposition. Specht responds that he adequately raised the issue in his pleadings.

To the extent the district court erred in failing to give Maximus ten days' notice of its intent to enter summary judgment on the issue of waiver, such error was harmless. After the court's summary judgment decision, Maximus filed a motion for a new trial in which it argued that the district court violated Rule 56's ten-day notice requirement and that genuine issues of material fact precluded summary judgment on the basis of waiver. The district court then entered a detailed order analyzing the waiver issue. It again held as a matter of law that Maximus waived any condition precedent regarding additional approvals. The court concluded that Maximus had raised no new arguments or evidence for reconsideration of the waiver issue. Instead, Maximus simply reasserted its arguments regarding the proper interpretation of the approval requirement.

Inasmuch as Maximus received an opportunity to present the court with arguments and evidence, any error resulting from the district court's failure to provide notice prior to its ruling was harmless. *Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 923 (5th Cir. 2000).

*2. Substantive Error*

Maximus alleges the district erred in granting summary judgment on the basis of waiver because genuine issues of fact exist as to whether Maximus waived the requirement that Specht obtain additional approvals. Though acknowledging that waiver is ordinarily a question of fact, the district court concluded that there was no dispute as to the facts underlying this case: "the

actions Maximus admits to taking with regard to Specht's OAR are fundamentally inconsistent with asserting further approvals as a condition precedent to paying his commission on that OAR."

We look to Texas substantive law in deciding this contract dispute. *Bexar County Hosp. Dist. v. Factory Mut. Ins. Co.*, 475 F.3d 274, 276 (5th Cir. 2007). Texas law defines waiver as "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987).

> Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances. There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right.

*Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (per curiam) (internal citations omitted). Thus, "while waiver may sometimes be established by conduct, that conduct must be unequivocally inconsistent with claiming a known right." *Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005). Moreover, "waiver by implication should not be inferred contrary to the intention of the party whose rights would be injuriously affected thereby, unless the opposite party has been misled to his or her prejudice." *Barua v. County of Dallas*, 100 S.W.3d 629, 634 (Tex. App.—Texarkana 2003, pet. denied). "Waiver is ordinarily a question of fact, but when the surrounding facts and circumstances are undisputed, . . . the question becomes one of law." *Jernigan*, 111 S.W.3d at 156.

Maximus contends that none of its actions were inconsistent with its right to require additional approvals. Specht submits, however, that Maximus's conduct – in proceeding with the Texas IEE project as proposed in his OAR and using his services in subsequent negotiations to secure the contract, without

indicating to him that the OAR was deficient – was inconsistent with an intent to require further approvals. Specht argues that Maximus should have presented any objections to the OAR at the "opportunity approval" stage so that he could have resolved the problem prior to Maximus's further pursuit of the project. Specht points out that Maximus's CEO, Lynn Davenport, sent an e-mail commending Specht for his efforts on the project. Additionally, Ginsburg sent an e-mail to David Casey, the President of Maximus's Corporate Marketing Division, stating, "[o]pportunity approval requests have been submitted, reviewed and approved for a number of campaigns. The most notable of which are the Texas Eligibility, Michigan Eligibility and Michigan MMIS."[2]

Maximus acknowledges this conduct but construes it differently. Because state marketing executives, such as Specht, often worked on projects for which they were not entitled to a commission, "Specht's involvement with the Texas IEE project would not indicate to the various divisions and groups having profit and loss responsibility for that project" that Specht was seeking a commission for his work. Under this interpretation, the divisions' decisions to proceed with the project and Specht's involvement with the project would not be inconsistent with Maximus's intent to deny Specht the commission.

There is no dispute of fact that Maximus had a right to require additional approvals as a precondition to the payment of his commission. Starting from that fact, there is some basis to conclude that Maximus's pursuit of the Texas IEE project was not unequivocally inconsistent with its intent to exercise its

---

[2] Specht further argues that Ginsburg sent him a number of monthly reports indicating that the OAR for the Texas IEE project had been "Approved." However, these reports were attached to Specht's response to the motion for a new trial, which was filed after the district court ruled on the motion. As such, these reports were not before the district court at the time of its ruling, and they are not subject to our review. *See Martin's Herend Imps., Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 774 (5th Cir. 1999) ("When we consider an appeal of a summary judgment, our review is confined to an examination of materials before the lower court at the time the ruling was made; subsequent materials are irrelevant." (internal quotation marks and citations omitted)).

right to the approvals. For example, there was some evidence that state marketing executives might work on a project for which they would not receive a commission. Thus, requiring Specht's participation in the bidding and acquisition process did not clearly establish Maximus's intent to waive the requirements for Specht's receipt of a commission. Likewise, the e-mail thanking Specht for his work on the campaign is not inconsistent with Maximus's intent to require all approvals prior to expressions of gratitude being turned into a commission.

A closer question arises from Ginsburg's e-mail to Casey, which indicated that Specht's OAR had been "submitted, reviewed and approved." This e-mail was part of a chain of internal e-mails between Ginsburg and Casey. Specifically, Ginsburg's e-mail was in response to one from Casey in which Casey indicated that the parties involved needed "to discuss what triggers the commission payment and the appropriate amount." In addition to stating that OARs for a number of campaigns, including Specht's, had been "submitted, reviewed and approved," Ginsburg's e-mail provided Casey with some information regarding the Capital Cities Group's commission plan and indicated that the matter still needed to be discussed in "more detail."

In interpreting whether that e-mail resolves the waiver point, we find Ginsburg's supplemental declaration also to be relevant. Ginsburg stated that state marketing executives "were first required to obtain my approval as their supervisor before approaching the Responsible Divisions and Groups. By signifying my approval on the OAR, I was only acting as their supervisor. I did not have any authority to approve an OAR on behalf of any Responsible Divisions and Groups." Considering the context of the e-mail and Ginsburg's testimony, it is not clear what Ginsburg meant when he said Specht's OAR had been "submitted, reviewed and approved." One reasonable interpretation is that

Ginsburg was referring only to his own approval. Another is that Ginsburg was making a representation that all appropriate approvals had been obtained.

Ginsburg's meaning is unclear and disputed.

Ginsburg's e-mail and the factual circumstances surrounding it, including Maximus's continued pursuit of the Texas IEE project, are sufficient to create a fact question regarding whether Maximus waived any precondition to the payment of Specht's commission. But there is just a fact question. The district court erred in granting summary judgment in favor of Specht on this issue.

B.    Breach

Though originally ruling on waiver, the district court also found that approval by two Maximus executives, one being the Vice President of Corporate Marketing and Business Development for the Capital Cities Group and the other the President of Maximus's Health Services – Health Systems Division, was "approval from all 'appropriate division(s) and/or group(s).'" The court rejected as unreasonable Maximus's argument that "appropriate division(s) and/or group(s)" meant "'each subdivision of Maximus that might ultimately sustain profit and loss from the Texas project.'"

In construing a written agreement, a court's primary concern "is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). The court must initially decide "whether it is possible to enforce the contract as written, without resort to parol evidence." *Id.*

> If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity.
>
>    If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Only where a contract is

first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument.

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (internal citations omitted).

Our question is whether the "appropriate division(s) and/or group(s)" provision is ambiguous such that a fact issue was created regarding the intended meaning of this language. Neither Maximus nor Specht claims that the approval requirement is ambiguous. They do, however, offer different interpretations of what the parties intended that provision to mean.

Maximus maintains that "appropriate" approval means "approval from all of the divisions and groups that would be responsible for a portion of the profit or loss" for a particular project. For the Texas IEE project, approvals were required from the following: Corporate Marketing-Business Development-Capital Cities, Health Systems Division, Workforce Services Division, Health Services Group, Human Services Group, President, and Chief Operating Officer. Maximus explains that its interpretation is reasonable because Specht's commission would be paid by the divisions and groups involved and would affect their budgets for the project.

Maximus further contends that there is nothing within the four corners of the Goal Letters from which the court can determine the intended meaning of "appropriate division(s) and/or group(s)." Therefore, parol evidence must be examined to construe the provision. For support, Maximus cites a case in which this court held, as a matter of law, that the phrase "appropriate work force" was ambiguous because nothing in the consent decree in which it was contained shed light on the intended meaning of the adjective "appropriate." *Dean v. City of Shreveport*, 438 F.3d 448, 461 (5th Cir. 2006). Finally, Maximus argues that consideration of parol evidence is proper because the Goal Letters summarizing

the commission plan were not contracts. Rather, they were written summaries of the parties' oral compensation agreement. Thus, Maximus says that parol evidence is needed to determine the entire scope of the parties' agreement.

The primary parol evidence Maximus offers is in Ginsburg's declaration. Specifically, Maximus points us to Ginsburg's statement that he orally discussed with Specht the requirement that he obtain approvals from all divisions or groups that would share profit and loss responsibility for a project. Ginsburg also declared that this understanding was communicated to Specht and other state marketing executives through handouts he provided them. The handouts stated: "The State Marketing Executive will be compensated for opportunities that have been approved by the Divisions/ Groups/ SBU's (as applicable)." In addition to Ginsburg's testimony, Maximus argues that Specht's understanding of the appropriate approval requirement is reflected on the OAR for the Texas IEE project wherein Specht identified additional divisions that might be involved with the opportunity, including Human Services – Human Services Operations and Technical Services – Technology Support. Maximus also points to the note at the bottom of the OAR stating that parties approving the form were "acknowledging [their] willingness to pay commissions in accordance with the Capital Cities compensation plan . . . ."

Specht offers a different interpretation of the approval provision. Like the district court, Specht submits that approval by the corporate marketing division and the lead division on the project was "appropriate" approval within the intended meaning of that term. Specht asserts that this is the only reasonable interpretation of the agreement. Maximus's construction is said to be unreasonable because a state marketing executive could not know at the opportunity approval stage which divisions or groups would ultimately work on an opportunity. With the Texas IEE project, for example, teaming arrangements were anticipated in the OAR, and the groups or divisions involved with the

project would differ depending on which company Maximus picked as a partner and whether Maximus took a lead role in the venture. Moreover, Maximus's organizational structure was in a state of flux during the bidding process for the Texas IEE project. There were changes in the corporate hierarchy, and many divisions or groups were re-organized as a result.

Specht also objects to Maximus's reliance on parol evidence.[3] Specht alleges that the Goal Letters were a contract between the parties. Because the parties agree that the contract is not ambiguous, parol evidence is not admissible. Furthermore, even if parol evidence is admissible, Ginsburg's testimony is incompetent because there is no evidence regarding when Ginsburg orally informed Specht that approvals were required from divisions with profit or loss responsibilities for a project. And there is no evidence regarding when Specht was given any commission plan handouts; it may have been after Maximus secured the Texas IEE opportunity.

We conclude that the approval provision is ambiguous, and its intended meaning should have been submitted to a jury. Neither of the parties has argued ambiguity, as both are urging to us their contrary versions of its meaning. However, whether an agreement is ambiguous is a matter of law for the court to decide. *See Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993) ("A court may conclude that a contract is ambiguous even in the absence of such a pleading by either party."); *see also J.M. Davidson, Inc.*,

---

[3] Though rejecting Maximus's use of parol evidence, Specht relies on parol evidence to support his interpretation of the approval provision. Specht contends that his construction is consistent with Maximus's customary operating procedures: a state marketing executive would give an OAR to Ginsburg who would then gather the signatures necessary for approval of the project. That is what Specht claims happened here. He gave his OAR to Ginsburg who signed it and forwarded it to Lau for his signature. Ginsburg did not obtain any additional approvals because none were needed. This argument and the evidence upon which it relies were first raised in Specht's response to Maximus's motion for a new trial. Again, such evidence was not before the district court at the time of its ruling; it will not be considered as part of our review. *See Martin's Herend Imps., Inc.*, 195 F.3d at 774.

128 S.W.3d at 231. Here, we cannot give the approval provision a definite or certain legal meaning because it is unclear what "appropriate" means with respect to the required OAR approvals.

We acknowledge that ambiguity requires two or more *reasonable* interpretations. Maximus's interpretation certainly places a more onerous burden on state marketing executives. Still, we cannot say that, as a matter of law, Maximus's construction is untenable or unreasonable. Although all Maximus divisions ultimately responsible for the Texas IEE project may not have been known at the time the opportunity was first identified, approvals could have been obtained from divisions and/or groups as their participation in and responsibility for the project became known. Moreover, it is undisputed that Specht did not even obtain approvals from all of the divisions and/or groups identified in his OAR as likely to play a role in the Texas IEE opportunity. Finally, as in *Dean*, the Goal Letters summarizing the parties' agreement "shed[] no light on what the adjective 'appropriate' means" in the context of the commission plan. 438 F.3d at 461.

As we cannot ascertain the true intentions of the parties from their agreement as written, the approval provision is ambiguous. "When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). Accordingly, the district court erred in ruling on this matter, which we remand to the province of the jury.

## III. CONCLUSION

We REVERSE the district court's grant of summary judgment and REMAND for further proceedings consistent with this opinion.

STEWART, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority opinion's description of the flow of events in this dispute between Maximus, Inc., and its former employee, Wayne Specht, as to whether Maximus owed Specht $300,000 in commission compensation. Specifically, the issue here is whether Specht fulfilled the requirements of the applicable compensation contract when he filled out and circulated a form regarding a business opportunity that he pursued–and eventually secured–for Maximus. That business opportunity resulted in $370 million of revenue to Maximus. Under the contract, if all conditions were met, Specht would have been eligible for a $300,000 commission from Maximus. The crux of the dispute is whether Specht secured "the approval of the appropriate division(s) and/or group(s) using the 'Opportunity Approval Request'" ("OAR") for the project. Specht did prepare and circulate an OAR, on the standard company form, which identified the lead division for the anticipated project as "Health Services-Health Systems" and listed additional divisions that "may be" involved. The form was signed by Specht's direct supervisor and the President of the Health Services division. Neither suggested that any additional circulation or approvals were needed, nor did they at any later time in the project's development and success for Maximus. Maximus refused to pay Specht and later eliminated his job position and terminated him.

The majority opinion addresses two alternative holdings on which the district court's grant of summary judgment in favor of Specht rested. First, it addresses the district court's conclusion that Maximus waived any objection to the form of Specht's OAR notice by its conduct in pursuing the opportunity. I concur in the majority opinion's determination that Maximus's procedural argument–that it was prejudiced by the district court raising waiver sua sponte–was harmless.

Next, the majority opinion addresses whether summary judgment was appropriate on the basis that there was a breach of contract–i.e., that Specht had complied with the contract regarding the OAR paperwork and that Maximus's refusal to pay Specht's commission was a breach of contract. The majority opinion concludes that the contract is ambiguous as to what approval from "all appropriate division(s) and/group(s)" means and whether this condition was fulfilled by Specht's conduct. Neither party to the dispute contends that the provision is ambiguous; they merely advance conflicting interpretations of the phrase. Though the parties did not urge ambiguity, I acknowledge the court's plenary authority to decide this issue as a matter of law. The majority opinion clearly describes these competing arguments and ultimately concludes that the provision at issue is ambiguous as a matter of law, and that the question must be submitted to a jury. I respectfully disagree with this holding. Essentially, Maximus would require the employee to secure approval from any even tangentially related division or group before pursing any project, guessing as to what might in hindsight be an affected group. On the other hand, Specht argued to the district court that his behavior conformed with a reasonable interpretation–that by notifying the key groups that appeared most likely to be centrally involved in the project at the initial stages of pursuing the opportunity, he secured the approval of the "appropriate division(s) and/or groups" as required by the contract. I agree with the district court's summary judgment determination that the contract is not ambiguous, that there are no disputed material facts at issue, and that Specht's offered interpretation presents "the true intentions of the parties as expressed in the instrument," *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517 (Tex. 1980).

For the foregoing reasons, I respectfully concur in part and dissent in part.